```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
CONNECTICUT GENERAL LIFE
INSURANCE COMPANY,

                Plaintiffs,

        -against-

ADVANCED CHIROPRACTIC
HEALTHCARE, and RAYMOND OMID,

                Defendants.
----------------------------------------------------------X
```

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★    OCT 10 2014    ★

LONG ISLAND OFFICE

MEMORANDUM AND ORDER

CV 13-2784

(Wexler, J.)

APPEARANCES:

BULKEY, RICHARDSON & GELINAS, LLP
By:  Andrew Levchuk
     Jodi K. Miller
1500 Main Street, Suite 2700
Springfield, NA 01115-5507
Attorneys for Plaintiff

QUADRINO & SCHWARTZ, PC
By:  Richard J. Quadrino
666 Old Country Road, 9th Floor
Garden City, NY 11530
Attorneys for Defendants

WEXLER, District Judge:

Plaintiff Connecticut General Life Insurance Company ("Connecticut General" or "Plaintiff") brings this action claiming fraud, unjust enrichment and money had and received against defendants Advanced Chiropractic Healthcare ("ACH") and Raymond Omid ("Omid") (collectively, "Defendants"), in connection with medical services provided and billed by Defendants, and paid by Plaintiff, Connecticut General. Defendants move to dismiss Plaintiff's action under Federal Rules of Civil Procedure ("Fed. R. Civ. Pro."), Rule 12(b)(6), claiming its

-1-

claims are preempted by the civil enforcement scheme created by the Employee Retirement Income Security Act ("ERISA"), and because the claims seek only monetary damages, which are unavailable under ERISA, they must be dismissed. For the reasons that follow, Defendants' motion is denied.

## BACKGROUND

I.  Factual Background

According to the facts alleged in Plaintiff's complaint, Connecticut General is a claims administrator on behalf of self-funded plans and also acts as a insurer for employer-sponsored plans. Complaint ("Cmplt."), ¶ 6. Defendant Dr. Omid manages and controls ACH. Cmplt., ¶ 8. Omid, his associates and ACH provide medical services to patients enrolled in Connecticut General Medical insurance plans. Cmplt., ¶ 9. Since about 2004, ACH maintained its own medical benefits plan for its employees through Connecticut General (the "ACH Plan"). Cmplt., ¶ 11. From 2005 to 2010, ACH submitted approximately $2 million in out-of-network claims to Connecticut General, including claims for services provided to its own employees. Cmplt., ¶ 14. In light of the unusually high number of claims submitted by ACH, Connecticut General conducted a review and found that claims submitted were either for services not covered or improperly coded as types of services other than those rendered. Cmplt., ¶ 16.

For example, Connecticut General discovered that Dr. Omid received chiropractic care and services approximately 1-2 times per week from 2006 through 2010, and ACH[1] submitted 290 claims to Connecticut General totaling $97,450.00 for services provided to Dr. Omid.

---

[1] Services prior to 2009 were provided by Advanced Holistic Realty, LLC, also owned and managed by Dr. Omid, and pursuant to its employee plan (the "AHR Plan"). The AHR Plan and the later ACH Plan have identical provisions. Cmplt., ¶¶ 20-22.

Cmplt., ¶ 19. Connecticut General paid $66,744.20 to ACH for services provided to Omid, yet an independent chiropractic advisor has since determined that these services were either not medically necessary or not covered under the ACH or AHR Plans. Cmplt., ¶ 17-24. The complaint alleges that these services were duplicates, did not indicate required assessments, and that "it is highly unlikely" that Dr. Omid paid his share of the services because "he either performed these services on himself as a professional courtesy to himself, or did not receive the services at all." Cmplt., ¶ 25-29. Futhermore, the high volume of services indicates the services were not "restorative" as required by the ACH or AHR Plans. Cmplt., ¶ 30.

The complaint outlines similar allegations in connection with other patients. For example, Patient A, an employee of ACH, received services from ACH 1-2 times per week, paid by Plaintiff in the amount of $66.916.50, which Plaintiff claims were not medically necessary and not covered. Patient C, an employee of AHR, received services at ACH approximately 1-3 times per week, for which Connecticut General paid $73,978.50 for approximately 342 claims, which Plaintiff claims were not medically necessary and not covered.[2] In addition, Connecticut General paid claims for treatments provided to two Doctors/Patients D & E who are "chiropractors affiliated with ACH." Cmplt., ¶¶ 33-83. Both Doctors/Patients provided services to each other that were covered by Connecticut General -- even on the same day. This meant, for example, that Doctor/Patient D treated Doctor/Patient E for suffering "spasms, edema, restriction, and tenderness" on the same day that Doctor/Patient E treated Doctor/Patient D for

---

[2]According to the Complaint, Patient C was covered under the AHR Plan from 2006 through 2008, and as of 2009 covered under a plan connected to Dr. Omid's home address. Both plans were with Connecticut General and have the same coverage and policy exclusions. Cmplt., ¶¶ 60-61.

"spasms, edema, restriction, and tenderness." Cmplt., ¶ 79-80. Plaintiff paid $101,124.58 on 369 claims for services provided by Doctor/Patient D to Doctor/Patient E; and $76,209.90 on 347 claims for services provided by Doctor/Patient E to Doctor/Patient D. Cmplt., ¶ 78. In addition to questioning whether these services were "medically necessary," Plaintiff also alleges that it "is highly unlikely that Doctor/Patient D and Doctor/Patient E paid their cost share obligation for these services because they either performed these services as a professional courtesy to each other or did not receive services at all." Cmplt., ¶ 82.

Connecticut General has further identified an additional five recipients of services that are either employed by ACH or related to ACH physicians or employees who submitted claims that are not covered under the ACH Plan. Cmplt., ¶ 88. The complaint alleges damages including $2 million in overpayments to Defendants, and asserts claims for fraud, unjust enrichment and money had and received. Defendants move to dismiss, claiming that ERISA[3] preempts Plaintiff's claims, and furthermore, since ERISA provides only equitable relief, and not money damages, Plaintiff's complaint should be dismissed in its entirety.

## DISCUSSION

I. <u>Legal Principles</u>

1. <u>Standards on Motion to Dismiss</u>

In considering a motion to dismiss made pursuant to Rule 12(b)(6), the court must accept the factual allegations in the complaints as true and draw all reasonable inferences in favor of Plaintiff. <u>Bold Electric, Inc. v. City of New York</u>, 53 F.3d 465, 469 (2d Cir. 1995). In <u>Bell

---

[3]Neither party disputes that the relevant plans qualify as employee benefit plans under ERISA.

Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the Supreme Court rejected the standard set forth in Conley v. Gibson, 355 U.S. 41 (1957), that a complaint should not be dismissed, "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," id., 355 U.S. at 45-46. The Supreme Court discarded the "no set of facts" language in favor of the requirement that plaintiff plead enough facts "to state a claim for relief that is plausible on its face." Twombly, 550 U.S. at 570; see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Although heightened factual pleading is not the new standard, Twombley holds that a "formulaic recitation of cause of action's elements will not do... Factual allegations must be enough to raise a right to relief above the speculative level." Twombley, 550 U.S. at 555. A pleading need not contain "'detailed factual allegations,'" but must contain more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678, quoting Twombley, 550 U.S. at 555 (other citations omitted). "Determining whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. Reciting bare legal conclusions is insufficient, and "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. A pleading that does nothing more than recite bare legal conclusions is insufficient to "unlock the doors of discovery." Iqbal, 556 U.S. at 678-679.

II.     Defendant's Motion to Dismiss

    1. Preemption

As stated by the U.S. Supreme Court, "Congress enacted ERISA to 'protect ... the interests of participants in employee benefit plans and their beneficiaries' by setting out

substantive regulatory requirements for employee benefit plans and to "'provid [e] for appropriate remedies, sanctions, and ready access to the Federal courts.'" Aetna Health Inc. v. Davila, 542 U.S. 200, 208, 124 S.Ct. 2488, 2495 (2004) (quoting 29 U.S.C. § 1001(b)). To ensure "a uniform regulatory regime," ERISA has "expansive preemption provisions" to ensure employee benefit plan regulation would be "exclusively a federal concern." Id., 542 U.S. at 208, 124 S.Ct. at 2495 (citations omitted). ERISA § 514(a)[4] explicitly states that it "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." In addition, ERISA § 502(a)[5] establishes a comprehensive civil enforcement scheme to further the goal "of creating a comprehensive statute for the regulation of employee benefit plans." Id. (citations omitted). This scheme, which permits certain enumerated parties to seek certain remedies, would be "completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA." Id., 542 U.S. at 208-209 (citing Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (other citations omitted). Thus, a state law claim that "duplicates, supplements, or supplants the ERISA civil enforcement remedy" is preempted. Id., 542 U.S. at 209, 124 S.Ct. at 2495 (citations omitted).

A. Preemption under § 514(a)

As noted above, ERISA § 514(a) states that it "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." Thus, a claim is preempted if it "relates to" the plan, or involves the issue of a members rights or benefits under a

---

[4]This is codified at 29 U.S.C. § 1144.

[5]This is codified at 29 U.S.C. § 1132.

plan. See Pirro v. National Grid, 2014 WL 1303414, *2 (N.D.N.Y. 2014) (state claims by employees against the plan for changes to the plan are preempted because they "relate to" the plan); Costa v. Astoria Federal Sav. and Loan Ass'n, 995 F.Supp.2d 146 (E.D.N.Y. 2014) (in action claiming wrongful denial of pension benefits, plaintiff's state law claims are preempted since they seek to enforce her rights under the plan) (string citation omitted); Kunsman v. Conkright, 977 F.Supp.2d 250, 266 (W.D.N.Y. 2013) (plaintiffs' claim that the defendants wrongfully misrepresented or concealed terms of the plan are preempted).

Yet, the Second Circuit has also recognized that certain state law claims are not preempted by ERISA. In Geller v. County Line Auto Sales, Inc., 86 F.3d 18, 22 (2d Cir. 1996), the Court found that "plaintiffs' fraud claim may stand." Id., 86 F.3d at 22. Acknowledging the expansive nature of preemption under ERISA, the Court noted that "the intent of Congress was not to foreclose every state action with a conceivable effect upon ERISA plans, but to maintain exclusive federal control over the regulation of such plans." Id.

In Geller, the benefit plan trustees brought unjust enrichment and fraud claims against the employer company and its officers for money paid for medical benefits for an employee, Patricia Kleppner. The defendant employer represented Kleppner's status as an employee, and after paying bills submitted for her medical treatment, the trustees learned she was the girlfriend of one of the defendant officers and never employed by the company. The plan trustees sought reimbursement of the claims paid. While the Court denied the restitution claim,[6] it found that the fraud claim was not preempted. "We are persuaded further in this conclusion by the fact that

---

[6]The Court found that since it was Kleppner and not these defendants who benefitted from the payment of the medical services, there was no basis for the restitution or unjust enrichment claim as to them. Id., 86 F.3d at 22.

although the defendants improperly administered the plan, the essence of the plaintiffs' fraud claim does not rely on the pension plan's operation or management. The 'bare bones' of the claim are that 1) the defendants fraudulently misrepresented that Kleppner was a full-time employee and 2) in reliance on the defendants' representation, the plaintiffs paid out more than $104,000 on her behalf. The plan was only the context in which this garden variety fraud occurred." Geller, 86 F.3d at 23. Further, "'insuring the honest administration of financially sound plans' is critical to the accomplishment of ERISA's mission." Id.

Similarly, in DaPonte v. Manfredi Motors, Inc., 157 Fed.Appx. 328 (2d Cir. 2005), a case claiming defendants fraudulently promised to provide coverage, the Court found it was a "garden variety fraud" claim in the context of an ERISA plan [and] does not trigger preemption where the fraud claim "does not rely on the [ERISA] plan's operation or management." Id., 157 Fed.Appx. at 331 (quoting Geller, 86 F.3d at 22-23). See also Babcock ex rel. Computer Management Sciences Inc., Employee Stock Ownership Plan and Trust Babcock ex rel. Computer Management Sciences Inc., Employee Stock Ownership Plan and Trust v. Computer Associates Intern., Inc., 186 F.Supp.2d 253, 258-259 (E.D.N.Y. 2002) (noting that ERISA generally will not preempt claims that involve fraud or misrepresentation which are not based upon the operation or management of the benefit plan, but finding that a breach of contract claim asserting failure to abide by terms of plan is preempted, citing Geller, 86 F.3d at 23); Enigma Management Corp. v. Multiplan, Inc., 994 F.Supp.2d 290, 302-303 (E.D.N.Y. 2014) ("The Second Circuit has held that state common law claims of fraudulent misrepresentation are preempted by ERISA if the false representation concerns the existence, terms, or benefits of an ERISA plan; a fraudulent misrepresentation claim is not preempted if "neither the existence of an ERISA plan nor the

interpretation of any such plan's terms is material to the claim") (citing DaPonte v. Manfredi Motors, Inc., 157 Fed.Appx. 328, 331 (2d Cir. 2005) and Geller v. Cnty. Line Auto Sales, Inc., 86 F.3d 18, 23 (2d Cir. 1996)).

In Gerosa v. Savasta & Co., Inc., 329 F.3d 317 (2d Cir. 2003), the Second Circuit provided further guidance on ERISA preemption. A plan's trustees brought claims against the fund's actuary, claiming that the fund was dangerously underfunded. Plaintiffs sought to bring a civil enforcement action under 29 U.S.C. §§ 1132(a)(3), as well as state law claims for breach of fiduciary duty, breach of contract and professional malpractice. The actuary moved to dismiss claiming the claims were preempted and the remedies sought were not available under ERISA. The district court ruled the state claims were preempted, but said the plaintiff could get consequential damages under the statute.

In reviewing whether the actuarial negligence claim was preempted, the Second Circuit noted the U.S. Supreme Court's guidance that when dealing with the "nearly limitless 'relates to' language," id., 329 F.3d at 323, a district court should look to the objectives of ERISA "as a guide to the scope of state law that Congress understood would survive." Id., at 323 (citing N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 656, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995); see also Egelhoff v. Egelhoff, 532 U.S. 141, 147, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001); Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., 519 U.S. 316, 325, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997); Cicio v. Does, 321 F.3d 83, 93 (2d Cir. 2003)). Thus, "the extent to which ERISA's remedial provisions preempt state law is not necessarily absolute; as with any provision, preemption must be considered in light of Congress's purposes in enacting the statute." Id., 329 F.3d at 325.

The Second Circuit ruled that plaintiff's claims for actuarial negligence were not preempted. The Court reasoned that ERISA's remedy scheme, which provides only the "appropriate equitable relief," would not be able to provide "any meaningful deterrent effect on negligent actuaries, since such relief cannot compare to a common-law action for damages...."[7] Id., 329 F.3d at 329. Furthermore, the Court further noted that preemption would "immuniz[e]" actuaries," and thus undermine "the financial integrity of the plans Congress intended to protect. Id. As stated in Geller, "'[I]nsuring the honest administration of financially sound plans' is critical to the accomplishment of ERISA's mission.'" Id., at 330 (citing Geller, 86 F.3d at 23). Thus, the Court concluded "that, especially in light of our presumption in favor of preserving traditional state law, Congress cannot have intended to preempt the Trustees' unexceptional state-law claims. Any other result would threaten the very purposes Congress had in mind when it enacted ERISA."[8] Id., at 330.

While the Defendants cite decisions that hold otherwise, courts in other jurisdictions have followed the reasoning of Geller and found that ERISA does not preempt what is essentially a "garden variety" fraud claim. See Trustees of AFTRA Health Fund v. Biondi, 303 F.3d 765 (7th Cir. 2002) (finding the reasoning in Geller "persuasive" and concluding that claims against a plan

---

[7]In Gerosa, the Second Circuit, following Supreme Court rulings, confirmed that ERISA's express remedies should remain exclusive and that the federal courts could not imply other civil remedies. 329 F.3d at 322 & n. 6.

[8]The Second Circuit noted the trend of other circuits toward "less-expansive" views of preemption following the Supreme Court decision in Travelers Ins. Co., 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), and explicitly stated the "broad view" of preemption in Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270 (2d Cir. 1992) was superseded. This ruling was also more in line with the "narrower interpretation" of Geller. See Gerosa, 329 F.3d at 328.

participant for defrauding the plan about his marital status and continuing coverage for his ex-wife does not immunize him from tort liability under state law); Horizon Blue Cross Blue Shield of New Jersey v. Transitions Recovery Program, 2011 WL 2413173, *9 (D.N.J. 2011) (action brought by insurer seeking damages for allegedly fraudulent claims submitted by medical services provider is not preempted by ERISA); Prakash v. Pulsent Corp. Employee Long Term Disability Plan, 2007 WL 1864464, *3 (N.D.Cal. 2007) (claims that plan participants defrauded insurer in connection with disability coverage are not preempted); In re Pharmaceutical Industry Average Wholesale Price Litigation, 263 F.Supp.2d 172, 191 (D.Mass. 2003) (based on Geller and other cases, plaintiff's fraud claim under state consumer protection statutes against a pharmaceutical company is not preempted); but see D & H Therapy Associates, LLC v. Boston Mut. Life Ins. Co., 650 F.Supp.2d 143, (D.R.I. 2009) (noting Geller but finding that First Circuit precedent dictates that since interpretation of the plan's language is required to evaluate the fraudulent inducement claim, it is preempted by ERISA).

B. Disposition of the Motion Under § 514(a)

Following the Second Circuit in Geller and the reasoning of Gerosa, the Court finds that Plaintiff's claims here are not preempted by § 514(a). There is a distinction between claims that truly "relate to" an ERISA plan and should be preempted for the sake of uniformity and consistency, and those based on individual claims of fraud, like the allegations in this case. Here, the essence of Plaintiff's complaint is that the Defendant medical service providers defrauded the Plaintiff insurance company by billing and getting paid for medical services that were fraudulently provided to Dr. Omid, other doctors, other employees and/or relatives and friends.

While essentially a fraud claim, Connecticut General argues that the payments should not

have been paid because the services were not "medically necessary" or otherwise comport with the assessment and other mandates of the Plans. Defendants use this argument to claim that since the term "medically necessary" is defined by the Plans, interpretation of the Plan is required, and since the claim "relates to" the Plan and should be preempted. For example, Defendants argue that S.M. v. Oxford Health Plans (NY), Inc., 2013 WL 1189467, * 4 (S.D.N.Y. 2013) is instructive. In that case, the plaintiff brought suit after the plan ruled that her cancer treatment were "not medically necessary." The court ruled that a "determination of 'medical necessity' is a classic 'right to payment' as opposed to 'amount of payment' determination" that involves interpretation of the plan's terms and is therefore preempted. See also In re SmithKline Beecham Clinical Laboratories, Inc. Laboratory Test Billing Practices Litigation, 108 F.Supp.2d 84, 111 (D. Conn. 1999) (court found that fraud claims brought by a large group of insurers against a large group of providers for alleged overpayments were preempted since proving the existence and impeded operation of the plan was necessary to prove the claim).

The Court is not persuaded by the case law cited by the Defendants, much of which is from other circuits. The Smithkline case is distinguishable. There, a group of health care insurers and individuals brought claims against a clinical laboratory chain alleging RICO, ERISA claims of various state law claims. The court there noted that the "gravamen" of plaintiff's allegations were that payments sought were "in violation of the terms of the applicable health benefit plans," and thus found that the ERISA plan, and its "operation and management" were critical to establishing liability and therefore found preemption. Smithkline, 108 F.Supp.2d at 111. That is not this case, which does not involve numerous insurers and other plaintiffs bringing claims that involve the operation and management of a plan and a laboratory chain.

The Court is persuaded by the more recent reasoning of Gerosa, noting the trend towards a narrowing application of preemption, particularly since equitable remedies often don't provide the deterrence (and protections) ERISA hoped to foster. Furthermore, the Plaintiff here is not a plan participant or beneficiary for whom ERISA was enacted to protect, but the insurance company trying to recoup money paid for unnecessary treatment to the Defendant, his employees and/or family and friends. This is not a fraud claim concerning the "operation or administration" of an ERISA plan. Like Geller, the Plan here provides the context for what, at essence, is a "garden variety" fraud claim.

The Court finds the Geller case to be instructive. There, like here, the plaintiff insurance company was duped into paying for medical treatment based on allegedly fraudulent statements. There, the fraud was premised on the Defendants' assertion that the recipient of the services was an employee; here the fraud is based on who received the treatments and whether they were necessary. While the Court is mindful that the definition of "medically necessary" is relevant is deciding the legitimacy of Plaintiff's claims, the essence of the claim is fraud, and mere involvement of the definitions of the terms does not implicate the Plan so as to warrant preemption. See Geller, 86 F.3d at 23 (fraud claim will not be preempted merely for having a "tangential impact" on the plan). Here, permitting Plaintiff to pursue its fraud claims "would in no way compromise the purpose of Congress and does not impede federal control over the regulation of employee benefit plans." Id. Thus, the Court finds Plaintiff's claims are not preempted and Defendants' motion to dismiss is denied.

C. Preemption Under § 502(a)

Defendants also argue that this action should be preempted by ERISA's civil enforcement

scheme at § 502(a). In the sections applicable here, ERISA § 502(a) states that:

> A civil action may be brought--
>
> (1) by a participant or beneficiary--
>
>> (A) for the relief provided for in subsection (c) of this section, or
>>
>> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
>
> * * *
>
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan; ...

If a state law claim falls within the scope of § 502(a), it is "converted" to a federal ERISA claim and removable. Davila, 542 U.S. at 209, 124 S.C.t. at 2495-2496. In Davila, the Court found that a state law claim that fell "'within the scope' of ERISA § 502(a)(1)(B)" was "completely preempted." Id., 542 U.S. at 214, 124 S.Ct. at 2498 (citations omitted). Whether a state law claim falls within the scope of § 502(a) requires a two-pronged analysis, referred to as the Davila test by the Second Circuit. Montefiore Medical Center v. Teamsters Local 272, 642 F.3d 321, 328 (2d Cir. 2011). A state law claim is preempted under ERISA's civil enforcement section if brought (i) by an individual who has standing to assert rights under § 502(a)(1)(B), and (ii) no other independent legal duty is implicated by a defendant's actions. Id. The test is conjunctive and both prongs must be satisfied.

In Montefiore, the Second Circuit disaggregated the first prong of the Davila test into two: "[f]irst, we consider whether the plaintiff is the type of party that can bring a claim pursuant

to § 502(a)(1)(B); and second, we consider whether the actual claim that the plaintiff asserts can be construed as a colorable claim for benefits pursuant to § 502(a)(1)(B)." Id.

In Montefiore, the Second Circuit found preemption. There, the plaintiff hospital/medical service provider brought claims[9] against the union and employee benefit plan for failure to pay $1 million for medical services provided by the hospital to the plan members. The court first found that the hospital was one of the enumerated parties under § 502(a)(1)(B) entitled to bring a civil enforcement action since they were assigned the rights from the patients/plan members. Since the claim was about the "right of payment" not the "amount of payment," it was a "colorable claim for benefits" under § 502(a)(1)(B). Furthermore, because there was no "independent legal duty" beyond those provided by the plan, the claim was preempted. Montefiore, 642 F.3d at 332.

D. Disposition of the Motion Under § 502(a)

The Court finds that the Plaintiff here is not the type of party that can bring a claim under § 502(a)(1)(B), and therefore the first prong of the Davila test is not satisfied. § 502(a)(1)(B) permits a participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." While Defendants argue that Plaintiff Connecticut General is a "fiduciary" entitled to bring a claim under § 502(a), they cite no case law to support this, other than Davila and Montefiore. The Court notes that in both of those cases, the first prong of the Davila test was whether "the plaintiff is the type of party that can bring a claim

---

[9]The claims were breach of contract and quasi-contract claims. There were no allegations of fraud.

pursuant to § 502(a)(1)(B)." Davila, 542 U.S. at 214, 124 S.Ct. at 2498 (since plaintiff's claims "fall within scope of § 502(a)(1)(B), they are completely preempted); Montefiore, 642 F.3d at 328 (plaintiff's claims are preempted if they "fall within the scope of § 502(a)(1)(B)"). Here, Connecticut General is not a "participant or beneficiary," and therefore its claim does not "fall within the scope of § 502(a)(1)(B)."[10] Although unnecessary since all prongs of the Davila test must be satisfied to find preemption, the Court further finds that there is an "independent duty," beyond any obligation under the Plans, that requires the Defendant medical service providers to submit honest and accurate claims to the Plaintiff insurer.

Having considered the submissions of the parties as well as the applicable case law, the Court finds that Plaintiff's claims are not preempted under § 514 or § 502(a), and Defendant's motion to dismiss is denied.

## CONCLUSION

For the reasons stated above, the Court hereby denies Defendants' motion to dismiss Plaintiff's claims in its entirety.

SO ORDERED.

s/ Leonard D. Wexler
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
October 10, 2014

---

[10] The Court notes that while Connecticut General may be a "fiduciary" permitted to bring a claim under § 502(a)(3), the Davila test specifically refers to the right to bring a claim under § 502(a)(1)(B), and the Court declines to extend the Davila test beyond that, particularly in light of any case law from Defendants finding otherwise.

-16-